IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RANDAL SANTIAGO,

       Plaintiff,

      vs.                            Civ. No. 15-224  KK

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

       Defendant.

## MEMORANDUM OPINION AND ORDER[1]

   **THIS MATTER** is before the Court on Plaintiff's Motion to Reverse and Remand for Rehearing, With Supporting Memorandum ("Motion"), filed on October 28, 2015.  (Doc. 20.) The Commissioner of Social Security ("Commissioner") filed a Response on February 25, 2016 (Doc. 26), and Plaintiff filed a Reply on March 10, 2016.  (Doc. 28.)  Having meticulously reviewed the entire record and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

## I.  Standard of Review

   Judicial review in a Social Security appeal is limited in scope by 42 U.S.C. § 405(g) to two inquiries: first, whether substantial evidence supports the Commissioner's final decision[2]; and second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).   If substantial evidence supports the Commissioner's findings and the correct legal standards were applied, the Commissioner's

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to Magistrate Judge Kirtan Khalsa to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 4, 9, 10.)

[2]  A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision.  20 C.F.R. §§ 404.981, 416.1481.  This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision.

decision stands and the plaintiff is not entitled to relief.  *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).  "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal."  *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted).  Courts must meticulously examine the entire record, but may neither reweigh the evidence nor substitute their judgment for that of the Commissioner.  *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Id.*  While the court may not reweigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met."  *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. Fed. Aviation Admin.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II.  Applicable Law and Sequential Evaluation Process

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). To qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show that: (1) he is not engaged in "substantial gainful activity"; *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings[3] of presumptively disabling impairments; *or* (4) he is unable to perform his "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *Grogan* 399 F.3d at 1261. If the claimant cannot show that his impairment meets or equals a Listing, but he proves that he is unable to perform his "past relevant work," the burden of proof then shifts to the Commissioner, at step five, to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity ("RFC"), age, education, and work experience. *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a Social Security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006). "This is true

---

[3] 20 C.F.R. pt. 404, subpt. P. app. 1.

despite the presence of counsel." *Henrie*, 13 F.3d at 361. "The duty is one of inquiry and factual development," *id.*, "to fully and fairly develop the record as to material issues." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997). This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination. *Madrid*, 447 F.3d at 791-92. The duty is triggered by "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Hawkins*, 113 F.3d at 1167.

### III.  Background and Procedural Record

Plaintiff Randal Santiago ("Mr. Santiago") was born on September 20, 1959. (Tr. 144, 185[4]) Mr. Santiago completed four or more years of college. (Tr. 189.) Mr. Santiago's work history included customer service representative and water jet technician. (Tr. 189, 321.)

On February 27, 2013, Mr. Santiago protectively filed[5] an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401. (Tr. 144-45, 185-93.) Mr. Santiago alleged a disability onset date of August 17, 2012, because of dizziness, depression, anxiety, nausea, insomnia and headaches. (Tr. 188.) Mr. Santiago has not engaged in substantial gainful activity since his alleged disability onset date. (Tr. 17.) Mr. Santiago's date of last insured is December 31, 2016.[6] (Tr. 185.)

---

[4] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 17) that was lodged with the Court on August 28, 2015.

[5] Protective Filing Status is achieved once an individual contacts the Social Security Administration with the positive stated intent of filing for Social Security Disability benefits. The initial contact date is considered a claimant's application date, even if it is earlier than the date on which the Social Security Administration actually receives the completed and signed application. *See* 20 C.F.R. §§ 404.614, 404.630, 416.325, 416.340, 416.345.

[6] To receive benefits, Mr. Santiago must show he was disabled prior to his date of last insured. *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1347 (10th Cir. 1990).

Mr. Santiago's application was initially denied on July 25, 2013.  (Tr. 61, 62-75, 94-97.)

Mr. Santiago's application was denied again at reconsideration on October 8, 2013.  (Tr. 76, 77-

91, 99-101.)  On October 21, 2013, Mr. Santiago requested a hearing before an Administrative

Law Judge ("ALJ").  (Tr. 102-03.)  The ALJ conducted a hearing on March 6, 2014.  (Tr. 32-60.)

Mr. Santiago appeared in person at the hearing with non-attorney representative Catalina Marie

Cordoba Laaroussi.[7]  (Tr. 62, 92-93.)  The ALJ took testimony from Mr. Santiago (Tr. 38-53)

and an impartial vocational expert ("VE"), Leslie White.  (Tr. 53-59.)

On May 19, 2014, the ALJ issued an unfavorable decision.  (Tr. 12-26.)  At step one, she

found that Mr. Santiago had not engaged in substantial gainful activity since his alleged onset

date.  (Tr. 17.)  The ALJ therefore proceeded to step two and found that Mr. Santiago suffered

from the following severe impairments: "left Meniere's syndrome; status post le[f]t

endolymphatic sac to mastoid shunt; status post left retrolabyrinthine vestibular nerve section;

medial meniscus tear; osteoarthritis of the right knee; depression; and anxiety."  (*Id.*)  At step

three, the ALJ concluded that Mr. Santiago did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404,

Subpart P, Appendix 1. (Tr. 28.)

Because she found that Mr. Santiago's impairments did not meet a Listing, the ALJ went

on to assess Mr. Santiago's RFC, which is used to evaluate the claim at both step four and step

five.  20 C.F.R. §§ 404.1520(a)(4), 404.1520 (e, f, g).  The ALJ stated that

> [a]fter careful consideration of the entire record, I find that the claimant has the
> residual functional capacity to perform a range of light work as defined in 20 CFR
> 404.1567(b).  Specifically, the claimant can lift and/or carry twenty pounds
> occasionally and ten pounds frequently.  The claimant can stand and/or walk for
> six hours out of an eight-hour workday with regular breaks.  The claimant can sit
> for six hours out of an eight-hour workday with regular breaks.  The claimant can
> push and/or pull twenty pounds occasionally and ten pounds frequently.  The

---

[7] Mr. Santiago is represented in this proceeding by Michael Armstrong.  (Doc. 10.)

claimant can occasionally climb stairs and ramps, balance, stoop, crouch, kneel, and crawl.  He can never climb ladders, ropes, or scaffolds.  He should avoid even occasional exposure to hazardous machinery and unprotected heights.  He can understand, remember, and carry out detailed but not complex instructions.  He is able to maintain attention and concentration to perform detailed work tasks for two hours a time without requiring redirection to task.  He can have only occasional contact with the general public.  He can have only superficial interactions with co-workers and supervisors.  He requires a work environment with no more than a moderate noise level.

(Tr. 29.)  At step four, the ALJ concluded that Mr. Santiago was not capable of performing his past relevant work as a water jet technician.  (Tr. 24.)  At step five, the ALJ determined that considering Mr. Santiago's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could perform.  (Tr. 24-26.)

On September 24, 2014, the Appeals Council issued its decision denying Mr. Santiago's request for review and upholding the ALJ's final decision. (Tr. 4-6.)  On March 10, 2015, the Social Security Administration granted Mr. Santiago's request for more time to file a civil action.  (Tr. 1-2.)  On March 17, 2015, Mr. Santiago timely filed the instant action seeking judicial review of the Commissioner's final decision.  (Doc. 1.)

## IV.  Relevant Record History[8]

### A.    Mr. Santiago's Meniere's Syndrome – Medical Record Evidence

#### 1.    Ear Associates, P.C. – Dr. Karl Horn

On August 12, 2011, Dr. Karl Horn of Ear Associates, P.C., saw Mr. Santiago for follow up of his Meniere's syndrome, and noted that Mr. Santiago had "one bad episode and several smaller episodes in the last week or two."  (Tr. 303.)  Audiometric testing revealed a hearing

---

[8] Although the Court has considered the entire record, the Court is remanding based on Mr. Santiago's argument that the ALJ failed to explain her findings at step three that Mr. Santiago did not meet Listing 2.07 – *Disturbance of labyrinthine-vestibular function (including Meniere's disease)*, and therefore does not address all of Mr. Santiago's medical history.

threshold of 16 decibels in the right ear and 59 decibels in the left ear.[9]   (*Id*.)   Dr. Horn prescribed a prednisone taper.  (*Id*.)

On August 30, 2011, Dr. Horn saw Mr. Santiago for follow up of his Meniere's syndrome.  (Tr. 302.)  Dr. Horn noted that an intratympanic steroid injection had not proved to any significant benefit and that Mr. Santiago continued to have left-sided hearing loss and tinnitus.  (*Id*.)  Audiometric testing revealed a hearing threshold of 16 decibels in the right ear and 59 decibels in the left ear.  (*Id*.)   Dr. Horn suggested that Mr. Santiago undergo a left endolymphatic sac-to-mastoid shunt procedure and stated it had a 70% success rate.  (*Id.*)

On November 18, 2011, Dr. Horn performed a "left endolymphatic sac-to-mastoid shunt, cranioplasty, intraoperative seventh cranial nerve monitoring" due to Mr. Santiago's four-year history of left intractable Meniere's syndrome.  (Tr. 250-61.)  Dr. Horn noted that Mr. Santiago had been treated with diuretics, salt restriction and intratympanic Decadron without benefits and continued to have episodic vertigo with nausea and vomiting.  (Tr. 251, 254.)  Audiometric testing revealed a hearing threshold of "15 decimals in the right ear and 16 decimals in the left ear" [sic], and video nystagmography revealed left-sided weakness.  (*Id*.)  Dr. Horn indicated the procedure was completed with no complications.  (Tr. 258.)

On December 2, 2011, Dr. Horn saw Mr. Santiago for follow up and noted that he had done well after surgery, except for increased hearing loss and some disequilibrium.  (Tr. 299.) Dr. Horn stated that Mr. Santiago reported he had been free from true vertigo.  (*Id*.)

On August 28, 2012, Dr. Horn saw Mr. Santiago for follow up of his Meniere's syndrome.  (Tr. 298.)  Dr. Horn noted that Mr. Santiago had been recently treated with Medrol Dosepak which made his vertigo worse.  (*Id*.)  Mr. Santiago reported that he was constantly off

---

[9]   A hearing threshold of 56 to 70 decibels indicates a moderately-severe hearing loss. http://www.hopkinsmedicine.org/hearing/hearing_testing/understanding_audiogram.html.

balance, experienced recurrent episodes of vertigo, and continued to have aural fullness on the left side and left-sided aural tinnitus. (*Id.*) Mr. Santiago stated that he was very sensitive to sounds and used an earplug in his left ear during most of his waking hours. (*Id.*) Audiometric testing revealed a hearing threshold of 20 decibels in the right ear and 40 decibels in the left ear. (*Id.*) Bithermal caloric testing revealed a 76% left-sided weakness. (Tr. 298, 307.) Dr. Horn diagnosed left intractable Meniere's syndrome and suggested that Mr. Santiago undergo a left retrolabyrinthine vestibular nerve section. (Tr. 298.) Dr. Horn prescribed Valium for Mr. Santiago's episodes of vertigo. (*Id.*)

On October 23, 2012, Dr. Horn noted that Mr. Santiago had overall done well after surgery, but was experiencing expected disequilibrium two weeks postoperatively. (Tr. 288.) Dr. Horn instructed Mr. Santiago to perform vestibular exercises and to walk daily. (*Id.*)

On December 11, 2012, Dr. Horn indicated that Mr. Santiago had not experience vertigo since the vestibular nerve section, but continued to experience disequilibrium. (Tr. 287.) Mr. Santiago ago reported hyperacusis and tinnitus. (*Id.*) Dr. Horn prescribed Lunesta for sleep and instructed Mr. Santiago to perform his home vestibular exercises once per day. (*Id.*)

On December 14, 2012, Dr. Horn noted that Mr. Santiago's disequilibrium was slowly getting better, that he was still off balance with rapid head movement, and that he continued to have some left postauricular headaches. (Tr. 286.)

On March 12, 2013, Dr. Horn noted that Mr. Santiago was still experiencing dizziness described as persistent off balance, that he was unable to drive on the freeway, and was having difficulty sleeping. (Tr. 285.) Dr. Horn indicated that Mr. Santiago was at the point of maximal compensation. (*Id.*) Dr. Horn noted that if Mr. Santiago experienced persistent dizziness at this point, he would suggest that Mr. Santiago pursue disability for his vestibulopathy. (*Id.*)

### 2.    Southwest Neurosurgical Associates – Andrew K. Metzger, M.D.

On September 21, 2012, Dr. Andrew K. Metzger, M.D. of Southwest Neurosurgical Associates saw Mr. Santiago on Dr. Horn's referral.  (Tr. 272.)  Dr. Metzger noted that Mr. Santiago had Meniere's syndrome for about the last five years and that his symptoms had been refractory to multiple medications.  (*Id.*)  Dr. Metzger stated that Mr. Santiago's endolymphatic shunt helped him for about five months, but that his symptoms had recurred in a particularly severe manner.  (*Id.*)  Dr. Metzger determined that Mr. Santiago was a good candidate for left vestibular nerve sectioning via a retrolabyrinthine approach.  (*Id.*)

On October 8, 2012, Dr. Metzger and Dr. Horn performed a left retrolabyrinthine suboccipital craniotomy for vestibular nerve section on Mr. Santiago.  (Tr. 278-82.)

On December 4, 2012, Dr. Metzger noted that Mr. Santiago was no longer having bouts of Meniere's disease, but was still having considerable difficulty with ongoing disequilibrium. (Tr. 271.)  Dr. Metzger indicated that Mr. Santiago was gradually improving.  (*Id.*)  Dr. Metzger also indicated that Mr. Santiago reported anxiety, insomnia, and headaches in the morning.  (*Id.*) Dr. Metzger noted that he was hopeful Mr. Santiago's residual symptoms would eventually resolve.  (*Id.*)  Dr. Metzger prescribed Fioricet to treat Mr. Santiago's headaches.  (*Id.*)

On December 19, 2012, Dr. Metzger provided a "To Whom It May Concern" letter to Mr. Santiago's employer requesting that Mr. Santiago be allowed to extend his leave of absence because his surgical recovery had been slower than average and he needed more time for his symptoms to resolve.  (Tr. 270.)

### 3.    ABQ Health Partners - James Russo, D.O.

On January 23, 2013, Mr. Santiago reported to Dr. Russo that his vertigo had improved postoperatively, but that he continued to have headaches and had developed anxiety.  (Tr. 369-

72.)  Mr. Santiago expressed concern and discouragement that he may not be able to return to work.  (*Id.*)

On February 20, 2013, Mr. Santiago reported to Dr. Russo he had been having disabling vertigo.  (Tr. 373-75.)

On March 20, 2013, Mr. Santiago told Dr. Russo that he was having vertigo on a daily basis, and recognized that he was depressed.  (Tr. 377-79.)  Dr. Russo prescribed Valium for Mr. Santiago's vertigo and indicated that Mr. Santiago was not interested in any medications for his depression.  (*Id.*)

### 4.   <u>Jeffrey T. Jobe, M.D.</u>

On July 20, 2013, Mr. Santiago underwent a disability determination examination with Jeffrey T. Jobe, M.D.  (Tr. 327-30.)  Mr. Santiago told Dr. Jobe he has Meniere's disease and that it causes very bad dizziness.  (Tr. 327.)  He stated that he has dizziness now "24/7, even in his sleep."  (*Id.*)  Mr. Santiago reported that he could lift 30 pounds, could stand for 30 minutes at a time and a total of three hours in an eight-hour workday, could walk on level ground for 30 minutes, and could sit for two hours.  (Tr. 328.)  Mr. Santiago stated he could drive for 30 minutes, and could do household chores at a slow and steady pace.  (*Id.*)  Dr. Jobe conducted a limited physical exam.  (Tr. 328-29.)  Dr. Jobe's impression was

> The patient was pleasant and cooperative, he gave good effort.  He moved about the room easily at baseline, but with certain portions of the exam, he did demonstrate trouble with balance.  Which is consistent with his medical history. He should not be working any heavy equipment.  The dizziness is mildly to moderately functionally impairing.  The headaches and insomnia do not provide any functional impairment.

(Tr. 329.)

**5.**      **Mark Werner, M.D.**

On July 24, 2013, State agency nonexamining medical consultant Mark Werner, M.D., reviewed Mr. Santiago's medical evidence record.   (Tr. 69-71.)   Dr. Werner discussed Mr. Santiago's surgeries and persistent complaints of dizziness.  (*Id.*)  Dr. Werner assessed that Mr. Santiago could occasionally lift and/or carry 50 pounds, could frequently lift and/or carry 25 pounds, and could stand and/or walk six hours in an eight-hour workday.   (Tr. 69-71.) Dr. Werner further assessed that Mr. Santiago should never climb ladders, ropes or scaffolds, and should avoid even moderate exposure to hazards.  (Tr. 69-70.)

**6.**      **Rayme L. Romanik M.D.**

On October 7, 2013, State agency nonexamining medical consultant Rayme L. Romanik, M.D., reviewed Mr. Santiago's medical evidence record at reconsideration.   (Tr. 85-88.) Dr. Romanik discussed Mr. Santiago's updated medical history and noted that Mr. Santiago continued to experience some chronic dizziness.   (Tr. 88.)   Dr. Romanik assessed that Mr. Santiago should be limited to light duty work because his dizziness had not fully resolved. (*Id.*)

**B.**      **Mr. Santiago's Meniere's Syndrome  – Non-Medical Record Evidence**

**1.**      **Adult Function Reports**

**a.**      **Mr. Santiago – February 20, 2013**

Mr. Santiago stated that he was "dizzy all the time now."  (Tr. 169.)  Mr. Santiago stated he helped care for his father, could prepare simple meals, did some cleaning, cooking, laundry, small household repairs, and some outdoor sweeping.  (Tr. 171.)  Mr. Santiago reported that he could drive on neighborhood streets, but stayed off the highways and preferred having company

when he went out in case of problems.  (Tr. 169, 172.)  He reported that dizziness affected his ability to lift, squat, bend, stand, reach, walk, kneel, hear, and concentrate.  (Tr. 174.)

### b.  Mr. Santiago – August 28, 2013

Mr. Santiago reported that being dizzy and unbalanced prevented him from working. (Tr. 225.)  He stated he cleans, does laundry, cooks, and does some household repairs, but it all takes longer than usual.  (Tr. 226.)  Mr. Santiago stated he can drive, but does not go out for long periods and that his father drives him a lot.  (Tr. 227.)  Mr. Santiago reported he was dizzy all the time and it affects his ability to lift, squat, bend, stand, reach, walk, kneel, hear, see, remember and concentrate.  (Tr. 229.)

### 2.  Third-Party Adult Function Reports

### a.  Andy M. Santiago

On February 20, 2013, Mr. Santiago's father, Andy Santiago, reported that Mr. Santiago was always dizzy and unsteady, and that he does not sleep.  (Tr. 177-78.)  He stated that Mr. Santiago could drive on residential streets.  (Tr. 180.)  He reported that Mr. Santiago's dizziness affects his ability to lift, squat, bend, reach, walk, kneel, hear, stair climb, complete tasks, concentrate, understand, use his hands, and get along with others.  (Tr. 182.)

### b.  Michael A. Santiago

On August 27, 2013, Mr. Santiago's brother, Michael Santiago, reported that Mr. Santiago never knows when his dizziness will occur so he has to be careful with planning his daily activities.  (Tr. 212.)  He stated that Mr. Santiago very rarely drives because the dizziness comes on suddenly and creates a danger to himself and others.  (Tr. 215.)  He reported that Mr. Santiago's hearing had become "super hypersensitive" and that loud noises really bothered

his ears and head.  (Tr. 216-17.)  He stated that Mr. Santiago's dizziness affected his ability to bend, stair climb and concentrate.  (Tr. 217.)

### 3. <u>Dizziness Questionnaire</u>

On August 27, 2013, Mr. Santiago completed a Dizziness Questionnaire and represented that he experiences lightheadedness or a swimming sensation in his head; has a tendency to fall in all directions; experiences a sensation that he is turning or spinning inside; has a loss of balance when veering to the right or left; has headaches, nausea or vomiting; and has pressure in his head.  (Tr. 221.)  He stated his dizziness was constant and attacking.  (*Id.*)  He indicated that the dizziness occurred after his second operation, that it occurs four times a week, and that it lasts mostly all day.  (Tr.  222.)  Mr. Santiago indicated that he has difficulty hearing and a low buzzing noise in his left ear.  (*Id.*)

### 4. <u>Hearing Testimony</u>

Mr. Santiago testified at the administrative hearing that he has trouble hearing due to one ear that is "not so good."  (Tr. 36.)  Mr. Santiago testified that after his second surgery he experienced continuous dizziness, was unbalanced, and had nausea.  (Tr. 43.)  Mr. Santiago testified that he wakes each morning with a headache, and that he experiences dizziness and lightheadedness to some degree every day.  (Tr. 43-44.)  Mr. Santiago testified that he hears ringing in his ears most of the time.  (Tr. 46.)  Mr. Santiago testified that he has difficulty driving due to vertigo and dizziness, but can drive short distances.  (Tr. 39-40.)  Mr. Santiago testified that changing the position of his head to bend, squat or kneel creates real problems for him. (Tr. 46.)  He further testified that he can do basic household chores, but cannot do them for long periods of time.  (Tr. 48.)

## V.  <u>Analysis</u>

Mr. Santiago asserts three arguments in support of reversing and remanding his case, as follows: (1) the ALJ failed to give appropriate consideration to State agency examining medical consultant Eligio Padilla, Ph.D's opinion; (2) the ALJ failed to explain her step three findings placing her decision beyond meaningful judicial review; and (3) the ALJ's credibility assessment is not based on substantial evidence.  (Doc. 20 at 2.)  Because the Court finds grounds to remand as discussed below, the Court does not specifically analyze all of Mr. Santiago's arguments.

### A.      <u>Step Three Determination</u>

The ALJ determined at step three that Mr. Santiago did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 17.)  Mr. Santiago does not challenge the ALJ's step three findings related to his knee impairments or mental impairments. Mr. Santiago does, however, challenge the ALJ's step three findings related to his left Meniere's syndrome, status post left endolymphatic sac-to-mastoid shunt, and status post left retrolabyrinthine vestibular nerve section ("Meniere's syndrome").  Mr. Santiago argues that the ALJ failed to discuss or provide evidence to support her determination that Mr. Santiago was not presumptively disabled under Listing 2.07 *Disturbance of labyrinthine-vestibular function (including Meniere's disease)* as she was required to do.  (Doc. 20 at 19-22.)  Mr. Santiago specifically argues the ALJ failed to identify Listing 2.07 in her findings, and that the prior State agency nonexamining medical consultant determinations upon which she summarily relied to find Mr. Santiago not presumptively disabled under Listing 2.07 were themselves unsupported. (*Id.*)  As such, Mr. Santiago asserts that the step three findings are unreviewable by the Court. (*Id.*)

14

The Commissioner contends that the ALJ's step three findings are supported by substantial evidence and free of reversible legal error. (Doc. 26 at 11-16.) The Commissioner asserts that Mr. Santiago's Meniere's syndrome does not satisfy all of the requirements of Listing 2.07 because it is questionable whether his impairment resulted in "frequent" attacks of balance disturbance and tinnitus, or whether he met the 12-month duration as required. (*Id.* at 12-14.) The Commissioner further asserts that the ALJ's reliance on the opinions of State agency nonexamining medical consultants Drs. Werner and Romanik was appropriate because they each indicated they considered Listing 2.07 in their review of the medical record evidence. (*Id.* at 14-15.) Finally, the Commissioner contends that Mr. Santiago was able to manage his activities of daily living adequately. (*Id.* at 13.) The Court is not persuaded.

"At step three, the ALJ determines whether the claimant's impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges as so severe as to preclude substantial gainful activity." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (quotation omitted). The ALJ's step three finding should discuss the evidence and explain why the ALJ found that the claimant was not disabled at that step. *Id.* "[A]n ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting h[er] decision, the ALJ also must discuss the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects." *Id.* at 1009-10 (citation omitted).

Here the ALJ made the following step three findings:

> Prior determinations, including the opinions of state agency physicians, concluded that the claimant's impairments neither met nor equaled the severity of any listed impairment. SSR 96-6p provides that findings of fact made by state agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairments must be treated as expert opinion evidence of non-examining sources at the Administrative Law Judge and Appeals Council levels of administrative review. Administrative Law Judges and the Appeals Council may not ignore these

opinions and must explain the weight given to these opinions in their decision.  I find that the opinions of state agency physicians that the claimant's impairments neither met nor equaled the severity of a listed impairment are well reasoned and supported by the evidence of record.

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. . . .

(Tr. 18.)  It is indisputable that the ALJ did not make any reference to or identify that she considered Listing 2.07 in her step three findings.  Additionally, her reliance on "prior determinations" by State agency medical consultants, without more, fails to provide for any subsequent reviewer the evidence that supports her decision, the uncontroverted medical evidence she chose not to rely upon, or the significantly probative medical evidence she rejected.  This is error.  *Clifton*, 79 F.3d at 1009-10.  Moreover, the ALJ's reliance on the prior determinations is misplaced.  The Initial Disability Determination Explanation form and the Disability Determination Explanation at Reconsideration form each indicate that Listing 2.07 was considered.  (*See* Tr. 64, 85.)  However, neither of the State agency medical consultants identified Listing 2.07 in their explanations, neither of them addressed the criteria of Listing 2.07 that they considered, neither of them discussed how the evidence they reviewed negated the possibility that Mr. Santiago could be presumptively disabled under that listing, and neither of them explicitly stated that Mr. Santiago's Meiniere's syndrome did not meet the listing.  (*See* Tr. 69-71, 85-89.)  Thus, the ALJ based her summary conclusion that Mr. Santiago's impairments neither met nor equaled the severity of any listed impairment on findings that failed to even address the relevant listing.  "Such a bare conclusion is beyond meaningful judicial review."  *Clifton*, 79 F.3d at 1009.

The Court's inquiry, however, does not end there.  Instead, the Court must consider whether "confirmed or unchallenged findings made elsewhere in the ALJ's decision confirm the

step three determination under review."  *Fischer-Ross v. Barnhart*, 431 F.3d 729, 734 (10th Cir.

2005).  If such findings "conclusively preclude Claimant's qualification under the listings at step

three" such that "no reasonable factfinder could conclude otherwise,' then any step three error is

harmless.  *Id.* at 735.  If, however, there are no findings that "conclusively negate the possibility"

that a claimant can meet a relevant listing, we must remand to the ALJ for further findings.  *Id.*

The ALJ's failure to explain her conclusion at step three was not harmless error.  Here,

Mr. Santiago argues that he meets Listing 2.07 *Disturbance of labyrinthine-vestibular function*

*(including Meniere's disease)*, which is

> characterized by a history of frequent attacks of balance disturbance, tinnitus, and
> progressive loss of hearing.  With both A and B:
>
> > A.     Disturbed function of vestibular labyrinth demonstrated by caloric
> >           or other vestibular tests; and
> >
> > B.     Hearing loss established by audiometry.

20 C.F.R. pt. 404, subpt. P. app. 1, Listing § 2.07.  In describing the medical evidence, the ALJ

discussed Mr. Santiago's unsuccessful treatment for vertigo, left-sided hearing loss, and tinnitus,

and that he underwent two surgeries with Drs. Horn and Metzger in hopes of improving his

condition.  (Tr. 20-21.)   The ALJ discussed Mr. Santiago's reports of persistent balance

disturbance following his second surgery and that his left-sided hearing loss remained

unchanged.  (*Id.*)  The ALJ noted that Dr. Horn, Mr. Santiago's treating physician, advised

Mr. Santiago five months after his second surgery that he was at the "point of maximal

compensation" and suggested that Mr. Santiago pursue disability if his dizziness persisted.

(Tr. 21.)  The ALJ also discussed Dr. Jobe's consultative exam and that Mr. Santiago had trouble

with his balance during certain portions of the exam.  (Tr. 20-21.)  The ALJ gave significant

evidentiary weight to Dr. Jobe's opinion that Mr. Santiago's dizziness was mildly to moderately

impairing.   (Tr. 20-21, 22.)   Further, the ALJ's RFC findings imposed postural and environmental limitations specifically accommodating Mr. Santiago's balance disturbance, and imposed a noise limitation to accommodate his hyperacusis.  (Tr. 19-20.)  Although the ALJ ultimately gave great weight to the State agency medical consultant's opinions in finding Mr. Santiago not disabled, she did so without explanation and, as noted earlier, their opinions failed to substantively address Listing 2.07.   Thus, the medical record evidence the ALJ discussed, along with her RFC findings, do not affirmatively establish that Mr. Santiago cannot meet the requirements of Listing 2.07 or conclusively negate the possibility of any finding that Mr. Santiago is presumptively disabled under that listing.  *Fisher-Ross*, 431 F.3d at 734-35.

The record evidence is also probative.   The Court's review of the medical record evidence supports that Mr. Santiago reported frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing.  (Tr. 271, 272, 285, 286, 287, 288, 298, 299, 302, 303, 377-79.)  Moreover, audiometric testing repeatedly demonstrated left-sided hearing loss, and video nystagmography and bithermal caloric stimulation testing revealed left-sided weakness. (Tr. 251, 302, 303-304, 307.)   Mr. Santiago consistently reported to the Social Security Administration, as did others on his behalf, that his balance disturbance persisted despite medical treatment.[10]   (Tr. 169-74, 177-84, 212-19, 221-22, 225-29.)   Finally, Mr. Santiago testified regarding his balance disturbance, tinnitus, and hearing loss, and that he experiences symptoms every day.  (Tr. 36-48.)  Thus, the record contains probative evidence to create a question as to whether Mr. Santiago meets the criteria for Listing 2.07.

It is the ALJ's responsibility to decide the ultimate legal question whether a listing is met or equaled.  SSR 96-6p, 1996 WL 374180, *3.  Here, the ALJ erred at step three because she

---

[10] The Court notes that that ALJ found Mr. Santiago's statements concerning the intensity, persistence and limiting effects of his symptoms not entirely credible.  (Tr. 20.)  Because the Court is remanding based on the ALJ's step three error, the Court does not address the ALJ's credibility assessment.

failed to explain what evidence supported her decision, failed to explain the uncontroverted evidence she chose not to rely upon, and failed to explain the significantly probative evidence she rejected when she determined that Mr. Santiago's Meniere's syndrome did not meet Listing 2.07. *Clifton*, 79 F.3d at 1010. Further, because there are no findings elsewhere in the ALJ's decision that conclusively preclude Mr. Santiago's qualification under the listings at step three, such that "no reasonable factfinder could conclude otherwise," the ALJ's error is not harmless. *Fischer-Ross*, 431 F.3d at 735. Accordingly, the Court must remand to the ALJ to make the requisite findings at step three. *Clifton*, 79 F.3d at 1010.

### B.      Substantial Justification

The Commissioner bears the burden of proving that its position was substantially justified. *Kemp v. Bowen*, 822 F.3d 966, 967 (10th Cir. 1987). The test for substantial justification is one of reasonableness in law and fact. *Gilbert v. Shalala*, 45 F.3d 1391, 1394 (10th Cir. 1995). The government's position must be "justified in substance or in the main – that is, justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 US. 552, 565, 108 S. Ct. 2541, 101 L.Ed.2d 490 (1988). The government's "position can be justified even though it is not correct." *Hackett*, 475 F.3d at 1172 (quoting *Pierce*, 487 U.S. at 565.) A lack of substantial evidence on the merits does not necessarily mean that the government's position was not substantially justified. *Hadden v. Bowen*, 851 F.2d 1266, 1269 (10th Cir. 1988).

Here, the ALJ failed to apply the correct legal standard in determining the ultimate legal question of whether Mr. Santiago's impairment met or equaled a listing at step three. As such, the Commissioner's position as to this issue was not substantially justified.

**C.**     <u>**Remaining Issues**</u>

The Court will not address Mr. Santiago's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand.   *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## VI.  <u>Conclusion</u>

For the reasons stated above, Mr. Santiago's Motion to Reverse or Remand for Rehearing is **GRANTED.**   This matter is remanded for further proceedings consistent with the Court's findings.

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**